## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## ASHEVILLE DIVISION
## CIVIL CASE NO. 1:18-cv-00221-MR

| | |
|---|---|
| JANET PERDUE,                     ) | |
|                        ) | |
|            Plaintiff,        ) | |
|                        ) | |
|      vs.                     ) | **MEMORANDUM OF** |
|                        ) | **DECISION AND ORDER** |
| SANOFI-AVENTIS U.S. LLC,      ) | |
|                        ) | |
|            Defendant.      ) | |
| _____ ) | |

**THIS MATTER** is before the Court on the Defendant's Motion for Summary Judgment [Doc. 16] and the Plaintiff's Motion for Partial Summary Judgment [Doc. 19].

## I.  PROCEDURAL BACKGROUND

Janet Perdue (the "Plaintiff") brings this action against her former employer, sanofi-aventis U.S. LLC (the "Defendant"), asserting claims for violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 et seq., and for wrongful discharge in violation of North Carolina public policy as codified in the North Carolina Equal Employment Practices Act, N.C. Gen. Stat § 143-422.2(a).

The Defendant moves for summary judgment on the Plaintiff's claims. [Doc. 16]. The Plaintiff moves for partial summary judgment regarding her reasonable accommodation claim and the Defendant's Twelfth, Fourteenth, Fifteenth, and Sixteenth Affirmative Defenses. [Doc. 19].[1]

## II.    STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "As the Supreme Court has observed, 'this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.'" Bouchat v. Baltimore Ravens Football Club, Inc., 346

---

[1] The Defendant's Twelfth Defense is that it took affirmative steps to engage the Plaintiff in the interactive process so it could determine what, if any, accommodations could be made to assist the Plaintiff in performing the essential functions of her job. [Doc. 6 at 11]. The Defendant's Fourteenth Defense is that it provided a reasonable accommodation by offering the Plaintiff nights in a hotel, but the Plaintiff refused that accommodation. [Id. at 12]. The Defendant's Fifteenth Defense is that it provided a reasonable accommodation by offering the Plaintiff a more comfortable car, but the Plaintiff refused that accommodation as well. [Id.]. The Defendant's Sixteenth Defense is that it approached the Plaintiff about an open position in Greenville, South Carolina, but the Plaintiff refused that accommodation too. [Id.].

F.3d 514, 519 (4th Cir. 2003) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986)).

A genuine issue of fact exists if a reasonable jury considering the evidence could return a verdict for the nonmoving party. Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir. 1994), cert. denied, 513 U.S. 814 (1994). "Regardless of whether he may ultimately be responsible for proof and persuasion, the party seeking summary judgment bears an initial burden of demonstrating the absence of a genuine issue of material fact." Bouchat, 346 F.3d at 522. If this showing is made, the burden then shifts to the non-moving party who must convince the Court that a triable issue does exist. Id.

In considering the facts on a motion for summary judgment, the Court will view the pleadings and material presented in the light most favorable to the nonmoving party. Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986). Where, as here, the parties have filed cross-motions for summary judgment, the Court must consider "each motion separately on its own merits 'to determine whether either of the parties deserves judgment as a matter of law.'" Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003) (quoting Philip Morris Inc. v. Harshbarger, 122 F.3d 58, 62 n.4 (1st Cir. 1997)).

## III. FACTUAL BACKGROUND[2]

The Defendant operates a multinational pharmaceutical company in various locations, including Asheville, North Carolina. [Doc. 1 at ¶ 9]. The Plaintiff began working for the Defendant in November 2001. [Id. at ¶ 10, 28]. The Plaintiff worked as an Executive Sales Professional ("ESP"), which involves making drug sales calls with physicians across a set territory in addition to attending meetings and education programs. [Doc. 18-3 at 1]. ESPs typically spend 50% of more of their time traveling, depending on the geography of the territory they are assigned. [Id. at 2]. Generally, ESPs work more than forty hours per week. [Doc. 18-2 at 30-31].

In February 2013, the Plaintiff was placed on medical leave due to inflammation of her lungs, joints, and muscles, and a severe decrease in her ability to breathe. [Doc. 1 at ¶ 12]. In April 2013, the Plaintiff was diagnosed with an autoimmune disorder called Antisynthetase Syndrome. [Id. at ¶ 13]. The Plaintiff remained on short and long-term disability due to her symptoms as well as a surgery to remove a tumor in her head that was causing her to lose sight in one eye. [Id. at ¶¶ 15-19]. In December 2013, the Plaintiff

---

[2] "At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party." Scott v. Harris, 550 U.S. 372, 380 (2007). This summary of facts is presented for the analysis of the Defendant's motion for summary judgment, so the facts are viewed in the light most favorable to the Plaintiff.

returned to work on a 50% flex-time schedule.  [Id. at ¶ 20].  The Plaintiff returned to work full-time in late 2015 and continued to work in that capacity until January 2017.  [Id. at ¶ 21-22].

In January 2017, the Defendant restructured its entire sales organization.  [Doc. 18-17 at 2].  As part of the restructuring, the Plaintiff was transferred from a territory where she resided in Greenville, South Carolina to a territory in Asheville, North Carolina.  [Doc. 18-2 at 17].  The Asheville territory is much larger than the Greenville territory and required the Plaintiff to drive longer distances.  [Id. at 49].  After the reassignment, the Plaintiff's commute from Greenville to Asheville took an hour and twenty minutes one-way.  [Doc. 18-17 at 2].  Shortly after the restructuring, the Plaintiff's health began to deteriorate because of the increased travel.  [Doc. 18-28 at 2].[3]

Deborah Anderson ("Anderson") served as the Area Business Leader ("ABL") for the Greenville territory.  [Doc. 28-2 at 74].  At the time of the restructuring in January 2017, Anderson told the Plaintiff that there was a

---

[3] On March 9, 2017, the Plaintiff's doctor notified the Defendant that the Plaintiff was "medically unable to work" and would "need to be completely out of work for the next several weeks."  [Doc. 18-13 at 7].  The Defendant approved a leave of absence for the Plaintiff until April 3, 2017.  [Doc. 18-16 at 1].  On April 3, 2017, the Plaintiff's doctor advised the Defendant that the Plaintiff would need to extend her medical leave another month. [Doc. 18-28 at 4-5].  The Defendant extended the Plaintiff's paid leave of absence through May 14, 2017.  [Doc. 23-6 at 2].  On April 25, 2017, the Plaintiff's doctor notified the Defendant's third-party leave administrator that the Plaintiff could work 20-30 hours per week but was permanently restricted from travel outside of upstate South Carolina. [Doc. 18-50 at 2-3].

position opening in Greenville for which she believed the Plaintiff was qualified. [Doc. 18-2 at 79, 147]. The Plaintiff, however, told Anderson that she was not interested in the position because she did not believe she was qualified for it. [Id. at 81].

Merideth Hernandez ("Hernandez") served as the ABL for the Asheville territory and was the Plaintiff's supervisor after the restructuring. [Doc. 18-2 at 69-70]. In February 2017, Hernandez wrote to her immediate supervisor, Regional Business Leader Tim Cole ("Cole"), requesting that he either transfer the Plaintiff back into the Greenville territory or allow the Plaintiff to participate in job share because of her health issues. [Doc. 18-17 at 2].

Caitlin Hunt ("Hunt") was transferred to an ESP position in the Greenville territory as part of the restructuring. [Doc. 18-11 at 88]. Hunt thereafter reported to Anderson. [Doc. 28-2 at 74]. The year before the restructuring, Hunt worked as an ESP under a different manager and won the Defendant's Gold Award for her comparatively high sales figures. [Doc. 28-1 at 2].

The Defendant allows its employees to apply for "Flexible Work Arrangements" including "job share." [Doc. 18-4 at 4]. In February 2017, the Plaintiff contacted Hunt about the possibility of applying to job share Hunt's position. [Doc. 18-11 at 88]. The Defendant's policies regarding "Flexible

Work Arrangements" are explained in a document titled "Sanofi US Flexible Work Arrangements" (the "FWA Document"). [Id.]. The FWA Document defines "job share" as a "work agreement between two employees who pair up with each handling 50% of the time of a standard position." [Id.]. According to the FWA Document, job share "[i]s not an entitlement" and "[n]ot all positions may be suitable due to the type of work being performed, business needs, or performance concerns." [Id. at 3, 12].

The FWA Document has a "Job Share Checklist," which states that "[e]mployees may be eligible for a Job Share Work Arrangement by applying to their managers and HR Business Partners." [Id. at 11]. The FWA Document also has "Flexible Work Guidelines," which state that "[a]ll Flexible Work Arrangements must be approved in advance of their commencement." [Id. at 5]. They also say that employees must "maintain satisfactory performance prior to applying for a Flexible Work Arrangement" and that "[e]mployees who are not meeting performance expectations may have their request for a Flexible Work Arrangement denied." [Id. at 7]. According to the FWA Document, managers "consider each request individually" and "approve or deny a request . . . based on business conditions and the employee's satisfactory demonstration that his or her job is suitable for the

particular Flexible Work Arrangement and that business needs will continue to be met."  [Id. at 6].

On March 9, 2017, the Plaintiff and Hunt applied to job share Hunt's ESP position in the Greenville territory.  [Doc. 18-31 at 3].  Their job share proposal explicitly stated that the Plaintiff sought the job share "based on her current health issues."  [Id.].  Under the proposal, the Plaintiff would work Tuesdays, Thursdays, and every other Friday, while Hunt would work Mondays, Wednesdays, and every other Friday.  [Id. at 3].  Before the Plaintiff submitted the proposal, she acknowledged that "[t]he job share possibility will be determined by whether the business unit can support it." [Doc. 18-30 at 2].  Anderson needed to approve the Plaintiff and Hunt's job share proposal because she was the ABL in the region where the job share would occur.  [Doc. 18-2 at 104].

On March 24, 2017, a few weeks after the Plaintiff submitted the proposal, Hernandez texted the Plaintiff to tell her that a full-time position may soon be available in Greenville.  [Doc. 18-41].  The Plaintiff never responded to Hernandez.  [Id.].

Cole, Hernandez, and Anderson discussed the job share proposal several times.  [Doc. 18-12 at 88; 18-23, 18-36].  To account for the possibility of the proposal being approved, they sought and obtained a waiver

from the Defendant's policy that only allowed job shares to begin at the beginning of each quarter because consideration of the proposal was extending beyond March 31. [Doc. 18-34 at 2]. Although they were discussing the job share proposal and preparing for its approval, they acknowledged that the final decision on the proposal would depend on "the outcomes of the [Plaintiff and Hunt's] meetings with [Anderson]." [Id.].

On April 19, 2017, Anderson, Hunt, and the Plaintiff held an in-person meeting to discuss the job share proposal. [Doc. 18-2 at 105]. In addition to asking questions about the job share proposal, [Doc. 18-12 at 143-44], Anderson also asked Hunt "tough questions" regarding her performance, competence, and attention to detail. [Doc. 18-2 at 118-122; Doc. 28-2 at 166]. Specifically, Anderson mentioned Hunt's issues regarding the submission of her expense reports for the last few months. [Doc. 18-2 at 118-122; Doc. 18-44; Doc. 28-2 at 166]. Hunt responded that under her previous manager she had received a Gold Award in 2016 for her sales figures and received a positive year-end review in 2016. [Doc. 28-2 at 166]. Anderson told Hunt that she was judging her by what she had seen since the restructuring in 2017 and did not "care what [her previous manager] thinks about you." [Id.].

The Plaintiff testified that during the meeting, Anderson "asked about my health and then made some reference to that not being appropriate for her to ask." [Doc. 18-2 at 123]. Hunt testified that Anderson simply asked the Plaintiff, "[w]hen are you going to be coming back from medical leave?" [Doc. 28-2 at 168]. After Anderson asked, the Plaintiff "very openly explained to [Anderson] about [her] autoimmune disorder." [Doc. 18-2 at 119]. The Plaintiff conceded, however, that Anderson did not ask any extensive follow-up questions about the Plaintiff's health after hearing the Plaintiff's answer. [Id. at 123].

On May 2, 2017, the Plaintiff spoke with Kaitlin Santana ("Santana"), who worked in the Defendant's Human Resources Department. [Doc. 18-18 at 2]. During that conversation, Santana offered to provide the Plaintiff with hotel stays to limit the distance she needed to travel and a more comfortable car to make her travel more comfortable if she continued to work in the Asheville territory. [Id.].[4] The Plaintiff responded that neither option would help her. [Id.]. Santana also told the Plaintiff that she should look on the

---

[4] The Plaintiff testified that the Defendant only offered one hotel night per week or every other week. [Doc. 18-2 at 173-74]. On a motion for summary judgment, the Court draws reasonable inferences in the light most favorable to the non-moving party. See Hooven-Lewis v. Caldera, 249 F.3d 259, 265 (4th Cir. 2001). As such, the Court views the proposed accommodation in the light most favorable to the Plaintiff here.

Defendant's online portal to see if any jobs in the Greenville area were vacant. [Doc. 18-38 at 175]. By that time, however, there were no vacant positions in upstate South Carolina. [Doc. 25-6 at 231].[5]

On May 3, 2017, Anderson denied the Plaintiff's job share proposal and communicated the denial to the Plaintiff and Hunt by telephone. [Doc. 18-37]. Anderson explained to them that "at this point in time with all the changes happening at Sanofi, this would not be a good business decision." [Doc. 18-2 at 160-61]. Anderson said that she discussed her decision with Cole and the Defendant's Human Resources Department before notifying the Plaintiff and Hunt. [Id. at 85].

Later, Anderson elaborated that she denied the proposal because (1) Hunt lacked attention to detail regarding expense reports; (2) Hunt lacked attention to detail regarding oversampling of certain products; (3) Hunt was one of the lowest ESPs in the district in achieving a metric known as Call Plan Adherence; (4) the proposal did not include a day when the Plaintiff and Hunt would work together, which was important for planning; (5) Anderson only recently had begun supervising Hunt and felt uneasy about approving

_____

[5] Santana admitted that she was unaware that the Plaintiff had a disability at that time. [Doc. 21-15 at 47]. Santana believed that the Plaintiff needed accommodations because she was struggling to adapt to the new job in the larger Asheville territory, not dealing with a disability. [Id.].

job share for such a new employee; (6) the Greenville territory could not support a job share because it was underperforming at the time of the request; (7) Anderson felt that Hunt and the Plaintiff did not meet the qualifications for a job share; and (8) the recent restructuring had created a tense environment within the company. [Id. at 85-88, 236, 300; Doc. 18-49 at 2]. It was noted that the first of three of these stated reasons fell squarely within the basis for a denial of job share because of Hunt's performance. [Doc. 18-4 at 7].

Anderson said that she did not take the Plaintiff's disability into account when she denied the job share proposal. [Doc. 18-12 at 295]. Anderson said that she "didn't have a problem with [the Plaintiff]" and "[i]t wasn't [the Plaintiff's] ability that I really had a question about ever." [Id. at 295, 300].

Later that year, Hunt received a mid-year performance review, which included a manager evaluation for Anderson to complete and an employee self-evaluation for Hunt to complete. [Doc. 18-45].[6] In her self-evaluation Hunt wrote that her "[s]trategic planning could be improved for the second half of the year" and that her "[p]lanning and strategizing will be more

---

[6] Based on the record, the precise date of the performance review is unclear because the document only states that it occurred sometime between May 1, 2017 and August 31, 2017. [Doc. 18-45; see also Doc. 28-2 at 271] (stating that Hunt remembers only that the performance review occurred in 2017].

successful due to more familiarity to new territory."  [Doc. 18-45 at 3].  She also wrote that due to changes in the Defendant's sales organization related to the restructuring, "things that are important have perhaps fallen behind."  [Id. at 6].  Hunt also said that her "adaptability may have been challenged at the beginning of 2017" after she started working for Anderson.  [Id. at 7; see also Doc. 28-2 at 273-74].[7]  Anderson's section of the review noted that "[e]arly in the year, [Hunt] had some missteps with appropriate sampling, but quickly corrected her mistakes."  [Doc. 18-45 at 8].

Hunt suffered a seizure in May 2017, which she attributed to stress caused by her relationship with Anderson.  [Doc. 28-2 at 198-99].  Hunt was placed on medical leave until July 16, 2017.  [Id. at 220].  Hunt returned to work on July 17, 2017, although her doctors had been unable to ascertain a physical reason for the seizure.  [Doc. 28-2 at 222-23].  Roughly a month after Hunt returned from leave, she heard rumors that the Defendant was going to restructure again at the end of 2017.  [Doc. 28-2 at 224].  On September 25, 2017, Hunt suffered from seizure-like symptoms again.  [Doc. 25-9 at 5].  On November 3, 2017, Hunt resigned, saying she said that she "couldn't take working for Debbie Anderson anymore."  [Doc. 28-2 at 250].

---

[7] Hunt later claimed that she adapted to her new role by March 2017.  [Doc. 28-2 at 275].

After the job share with Hunt was denied, the Plaintiff looked for other jobs on the Defendant's online portal that she could perform with her restrictions but did not find one. [Doc. 18-2 at 182]. At that point, it was already rumored that the Defendant would be undergoing another restructuring at the end of 2017. [Doc. 18-20 at 2]. The Plaintiff hoped that she would be reassigned to the Greenville territory as part of the potential restructuring. [Id.].

On August 31, 2017, the Plaintiff informed the Defendant that she was unable to return to her full-time position, with or without accommodations, and did not know when she would be able to do so. [Doc. 18-1 at 2]. The Plaintiff also requested a part-time position but was told that the Defendant could not sustain a part-time position at that time. [Doc. 18-26].

On September 19, 2017, the Defendant terminated the Plaintiff's employment. [Id.].[8] The Defendant explained to the Plaintiff that her short-term disability ended and said it was unable to grant her an "indefinite leave of absence." [Doc. 18-2 at 198; 18-1].

---

[8] On May 12, 2017, the Defendant extended the Plaintiff's paid leave of absence until July 9, 2017. [Doc. 23-7]. On July 27, 2017, the Defendant extended the Plaintiff's paid leave of absence until September 6, 2017, retroactive to July 9, 2017. [Doc. 23-8].

## IV.   DISCUSSION

The Plaintiff claims that the Defendant violated the ADA in the following ways: (1) by failing to accommodate her disability; (2) by failing to engage in the interactive process; (3) by terminating her employment; and (4) by retaliating against her for requesting a reasonable accommodation.  [Doc. 1 at ¶¶ 55-56].   The Plaintiff also claims that the Defendant wrongfully discharged her in violation of North Carolina public policy.  [Id. at ¶¶ 59-68]. The Defendant moves for summary judgment on each of the Plaintiff's claims.  [Doc. 16].

### A.   Failure to Accommodate

The Plaintiff's primary claim is that the Defendant discriminated against her by failing to accommodate her disability.   The Defendant moves for summary judgment on the basis that the Plaintiff's forecast of evidence fails to create an issue of fact as to whether any reasonable accommodation was available.

The ADA protects a "qualified individual," which is defined as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  42 U.S.C. § 12111(8).  To prevail on a failure-to-accommodate claim brought under the ADA, the Plaintiff is required to

show that (1) she was a qualified individual; (2) the Defendant had notice of her disability; (3) she could perform the essential functions of the position she held or desired with a reasonable accommodation; and (4) the Defendant refused to make such accommodations.  See Wilson v. Dollar Gen. Corp., 717 F.3d 337, 345 (4th Cir. 2013).

The Plaintiff does not claim that she could be accommodated as an ESP in the Asheville territory.  Her physician said as much.  [Doc. 18-50 at 2-3].  In fact, the Plaintiff declined the accommodations that were offered in that position.  [Doc. 18-18 at 2].  Instead, the Plaintiff specifically requested the job share with Hunt in the Greenville territory as an accommodation.

The employer is "not obligated to provide the accommodation requested or preferred by the employee." Cravens v. Blue Cross & Blue Shield of Kansas City, 214 F.3d 1011, 1019 (8th Cir. 2000).  Under the ADA, however, the employer may need to reassign the employee to a vacant position as an accommodation if the employer is unable to identify a reasonable accommodation that will allow a qualified employee to continue performing the essential functions of his or her current job.  42 U.S.C. § 12111(9)(B).  Thus, the question before the Court is whether the Plaintiff has presented evidence that the position to be shared with Hunt in Greenville was vacant and therefore was available as an accommodation.

### 1. Vacancy

"'[A] vacant position' includes not only positions that are at the moment vacant, but also includes positions that the employer reasonably anticipates will become vacant in the fairly immediate future." Smith v. Midland Brake, Inc., 180 F.3d 1154, 1175 (10th Cir. 1999) (citing Monette v. Electronic Data Systems Corp., 90 F.3d 1173, 1187 (6th Cir. 1996)). The employer does not have to remove or reassign an employee to create a vacancy. Pond v. Michelin N. Am., Inc., 183 F.3d 592, 595 (7th Cir. 1999). The employer also does not have to create a new position to create a vacancy, see Bilinsky v. Am. Airlines, Inc., 928 F.3d 565, 572 (7th Cir. 2019), as amended (Aug. 9, 2019).

The Plaintiff argues that "Hunt's position existed both before and after [the] job share request," so the Plaintiff "was not asking for the creation of a new position." [Doc. 24 at 12]. According to the Plaintiff, Hunt's position became vacant when the Plaintiff and Hunt submitted their job share proposal. [Doc. 20 at 5].

Contrary to the Plaintiff's assertions, however, half of Hunt's position did not instantly become vacant when the Plaintiff and Hunt applied for job share. The Plaintiff's argument ignores the Defendant's policies. It was made clear to the Plaintiff and to Hunt that under those policies, job share

"[i]s not an entitlement." [Doc. 18-4 at 12]. Employees must apply to participate in job share and must have their application approved by a manager. [Id. at 5, 10]. Hunt could not unilaterally make half of her position available. She needed Anderson's approval to create such a vacancy. As such, Hunt's position did not become vacant the instant that the Plaintiff and Hunt applied for job share because Anderson had not yet approved the proposal.

The Plaintiff further argues that even if the job share proposal alone did not create a vacancy, the word "vacant" includes positions an "employer reasonably anticipates will become vacant in the immediate future." [Doc. 20 at 18] (citing Smith, 180 F.3d at 1175). According to the Plaintiff, the Defendant should have reasonably anticipated that half of Hunt's position would become available when the Plaintiff and Hunt applied for job share because the creation of that vacancy was entirely within Anderson's control. [Doc. 26 at 2].[9]

The Plaintiff correctly states the law but misapplies it to this case. The mere possibility that half of Hunt's position could become vacant if certain

---

[9] Notably, the Plaintiff does not cite, and the Court did not find, a single case under the ADA where a Court required an employer to reassign an employee to a position that never actually became vacant, regardless of whether the employer ever reasonably anticipated that the position would become vacant or not.

business criteria were met did not mean that the Defendant should have reasonably anticipated that half of Hunt's position would become available. The Plaintiff requesting the job share does not mean that the business considerations at hand would allow for such a job share. Taking the Plaintiff's evidence in the light most favorable to her, the vacancy was a mere possibility, not something the Defendant should have "reasonably anticipated."

The logical conclusion of the Plaintiff's argument shows its error. If the Plaintiff is correct, and the Defendant should have reasonably anticipated that a job share in the Greenville territory would become available, the Defendant would have been forced to either approve the job share with Hunt despite its concerns about her performance or create a new job share for the Plaintiff with some other unknown employee. The law, however, does not require either of these. An employer does not have to create a new position where no vacancy exists to make a reasonable accommodation for an employee. Lamb v. Qualex, Inc., 33 F. App'x 49, 59 (4th Cir. 2002). Likewise, an employer does not have to reassign a disabled employee to a permanent part-time position when that employee's primary position was full-time. Nartey-Nolan v. Siemens Med. Sols. USA, Inc., 91 F. Supp. 3d 770, 775 (E.D.N.C. 2015). Also, an employer does not have to reassign an

employee when the "reassignment would violate . . . a legitimate, nondiscriminatory policy of the employer." Cravens, 214 F.3d at 1020.

The Plaintiff argues, however, that Hunt's offer to job share created a vacancy because the law allows an employee to unilaterally "create a vacancy by offering their position to a coworker with a disability." [Doc. 26 at 3-4]. The Plaintiff supports her argument by citing to the Court's statement in Emrick v. Libbey-Owens-Ford Co. that "another employee's offer to voluntarily relinquish their position and accept reassignment . . . may be a valid means of attempting a reasonable accommodation." 875 F. Supp. 393, 397 (E.D. Tex. 1995). In Emrick, however, the Court said that "just because an employee makes known her willingness to be reassigned for the benefit of the disabled employee *does not necessarily mean that the employer is in a position to reassign her to another position.*" Id. at 397 n.1 (emphasis added). As such, an employee's offer to vacate a position is not enough to create a vacancy. The employer also must be "in a position to reassign her to another position." Id.

Here, Hunt made known her willingness to accept job share, but Anderson determined that Hunt was not suitable for a job share based on her performance and because "at this point in time with all the changes happening at Sanofi, [approving the job share] would not be a good business

decision." [Doc. 18-2 at 160-61]. As such, Anderson determined that the Defendant was not in a position to reassign the Plaintiff to the job share with Hunt. Emrick supports the Defendant's argument rather than the Plaintiff's.

For these reasons, the Plaintiff has failed to present a forecast of evidence to show that the job share position was vacant and therefore was available as an accommodation.

## 2. Exception to the Defendant's Policies

The Plaintiff next argues that the Defendant "cannot hide behind" its policies to deny the job share proposal. [Doc. 24 at 16] (citing U.S. Airways, Inc., v. Barnett, 535 U.S. 391 (2002)). In Barnett, the Supreme Court held that "ordinarily," a requested accommodation will not be reasonable if it conflicts with the rules of an employer's policy. 535 U.S. at 406. As such, the employer will be entitled to summary judgment "unless there is more" like "special circumstances" that make an exception to the policy reasonable under the particular facts of a case. Id. The plaintiff bears the burden of showing that special circumstances exist, and can do so by explaining "why, in the particular case, an exception to the employer's . . . policy can constitute a 'reasonable accommodation' even though in the ordinary case it cannot." Id. at 406.

The Plaintiff argues that the Defendant "fails to show whether reassignment to job share would be reasonable" so "it has not met its initial burden and summary judgment must be denied." [Doc. 24 at 18]. The Plaintiff misconstrues <u>Barnett</u>, which only requires the Defendant to show that the requested accommodation conflicts with the rules of its policy. 535 U.S. at 406. If the Defendant does so, the Plaintiff must then show "why, in the particular case, an exception to the employer's . . . policy can constitute a 'reasonable accommodation' even though in the ordinary case it cannot." <u>Id.</u> at 406.

As discussed <u>infra</u>, the forecast of evidence shows that Anderson followed the Defendant's job share policy and denied the job share proposal for business reasons related to Hunt's job performance. <u>See</u> Sec. IV.A.2. As such, the Plaintiff's requested accommodation was denied consistent with the Defendant's policy, which made approval of job share proposals conditional based on "business conditions" and other considerations. [Doc. 18-4 at 6]. Therefore, the Defendant's denial will be considered reasonable unless the Plaintiff can show "special circumstances" warranting a finding that, despite the employer's policy, the requested accommodation was reasonable on the particular facts of this case. <u>Barnett,</u> 535 U.S. at 405.

The Plaintiff has failed to present a forecast of evidence to support such a finding. The Plaintiff argues that job shares had previously been "used as an accommodation" for "employees with medical conditions and family situations." [Doc. 24 at 19]. The issue, however, is not whether a job share can be used as an accommodation for a disabled employee. The question is whether the Defendant's policy of denying a job share based on concerns about a fully-abled employee (Hunt) is unreasonably applied. The Plaintiff offers no forecast of evidence on this point.

The Plaintiff further argues that she had previously participated in job share. [Id.]. The Plaintiff, however, fails to provide a forecast to demonstrate how that the Plaintiff's experience with a job share would affect the Defendant's concerns about Hunt's performance.

Finally, the Plaintiff argues that the Defendant had already made an exception to its policy for the Plaintiff by waiving its requirement that job shares can only begin at the start of a new quarter. [Doc. 24 at 19]. The Plaintiff fails to demonstrate how that exception would make the job share more reasonable. Since the decision regarding the job share was extending into the second quarter, this waiver merely kept the option of the job share open. This was to the Plaintiff's benefit. As such, the Plaintiff's forecast of evidence fails to show the "special circumstances" that Barnett requires to

override the Defendant's policy and defeat a motion for summary judgment.

Barnett, 535 U.S. at 394.

### 3. Pretext

The Plaintiff next argues that the Defendant's "purported reason [for denying the job share] was false and that discrimination based on Perdue's disability was the real reason" for denying the job share. [Doc. 24 at 20]. In short, the Plaintiff argues that the Defendant's stated reasons were merely a pretext for discrimination. This invokes the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). See also Ullrich v. CEXEC, Inc., 709 F. App'x 750, 753 (4th Cir. 2017).

Under the McDonnell Douglas test, the Plaintiff has the initial burden of establishing a prima facie case of discrimination. See Perry v. Comput. Scis. Corp., 429 F. App'x 218, 220 (4th Cir. 2011). To establish a prima facie case, the Plaintiff "must show that: (1) she is disabled; (2) she was otherwise qualified for the position; and (3) she suffered an adverse employment action solely on the basis of her disability." See id. (citing Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 498 (4th Cir. 2005)).

Once the Plaintiff establishes her prima facie case,[10] the burden shifts to the Defendant to put forth a legitimate, non-discriminatory reason for the action. See McDonnell Douglas, 411 U.S. at 802. If the Defendant provides such a reason, the Plaintiff "bears the ultimate burden of persuasion" and "must show by a preponderance of the evidence that the proffered reason was a pretext for discrimination." Perry, 429 F. App'x at 220.[11]

As an initial matter, it should be noted that merely asking about an employee's health does not show a discriminatory motive. See Tyndall v. Nat'l Educ. Centers, Inc. of California, 31 F.3d 209, 215 (4th Cir. 1994). "[A]n employer must feel free to explore workplace problems with an employee

---

[10] The Defendant argues that the Plaintiff has not met the third element of this initial burden because she does not claim that there was an available accommodation for the position she held in Asheville, and has presented no evidence that the jobs share position in Greeneville was ever vacant.

[11] The Plaintiff claims that the following forecast of evidence shows the pretextual nature of the Defendant's decision: (1) Anderson knew about Hunt's performance issues but still sought a meeting so that she could ask questions about the Plaintiff's health; (2) Anderson originally failed to give an explanation for the denial before later explaining that it was for business reasons related to Hunt's performance; (3) Anderson allegedly told people "I bet there's more to that story" regarding the Plaintiff's termination; and (4) the Defendant refused to reconsider the job share after Hunt received a good performance review from Anderson in her 2017 mid-year review. [Doc. 24 at 20-21; see Doc. 17 at 12, 18]. At the hearing held regarding the cross-motions for summary judgment in this case, the Plaintiff argued that the Defendant's pretext is further demonstrated by Anderson's refusal to consider Hunt's previous performance under a different manager and the juxtaposition between Hunt's excellent sales record and the Defendant's purported concerns about her ability to job share.

without fear of making actionable statements at every turn. The civil rights laws prohibit discrimination, not discussion." Id.

Moreover, "it is not the job of this court to decide whether [the Defendant] made the right choice by not [approving the job share proposal]. Rather, our job is simply to decide whether [the Defendant] made an illegal choice." Hannah P. v. Coats, 916 F.3d 327, 345 (4th Cir. 2019). This Court does not "sit as a kind of super-personnel department weighing the prudence of employment decisions." Feldman v. Law Enf't Assocs. Corp., 752 F.3d 339, 350 (4th Cir. 2014) (citations omitted)

### a.    The Meeting

The Plaintiff argues that the meeting between Anderson, Hunt, and the Plaintiff regarding the job share proposal shows pretext because Anderson already had all the information regarding Hunt's performance when she requested the meeting. [Doc. 24 at 2]. According to the Plaintiff, Anderson only requested the meeting to investigate the Plaintiff's medical issues and did so during the meeting when she asked the Plaintiff about her health. [Id.].

The forecast of evidence, however, shows that Anderson made limited reference to the Plaintiff's health during the meeting, and only did so in response to the Plaintiff explicitly referencing her health in the job share proposal. [Doc. 18-31 at 3]. The Plaintiff and Hunt only recalled that

Anderson asked the Plaintiff, "[w]hen are you going to be coming back from medical leave?" [Doc. 28-2 at 168]. Anderson did not ask any extensive follow-ups after the Plaintiff described her medical status. [Doc. 18-2 at 123].

The Defendant's questions about the Plaintiff's status and when she could return were necessary since the job share proposal would need to begin quickly if it were approved and the Plaintiff was still on medical leave when the meeting occurred. As such, Anderson had to ask when the Plaintiff could return to work to know when the job share proposal could start. None of this suggests any discrimination or pretext. After all, the Plaintiff's ability to return to work part-time was central to her being able to "perform the essential functions" of the proposed job share. 42 U.S.C. § 12111(8).

The forecast of evidence also shows that the Defendant's standard practice was to hold a meeting when an employee requested a job share. [Doc. 18-5 at 239; Doc. 18-34 at 2]. The meeting explored far more than just the Plaintiff's health. Anderson expressed her concerns about Hunt's performance during the meeting. [Doc. 18-12 at 35]. Anderson also used the meeting to discern whether the job share was viable based on the routes, schedules, and logistical details that the Plaintiff and Hunt had submitted. [Doc. 28-2 at 159-166]. As the Fourth Circuit has said, "an employer must feel free to explore workplace problems with an employee without fear of

making actionable statements at every turn. The civil rights laws prohibit discrimination, not discussion." See Tyndall, 31 F.3d at 215.

The forecast of evidence associated with the meeting actually demonstrates the Defendant's lack of pretext.[12]  Prior to the meeting, both Anderson and the Defendant's Human Resources gave Hunt and the Plaintiff approval to proceed with submitting the job share proposal, rather than denying the proposal at that stage.  [Doc. 28-2 at 140-142].  Moreover, the Defendant prepared for the possibility of the job share being approved by seeking a waiver from a policy that would have prevented the job share from beginning immediately if approved.  [Doc. 18-34 at 2].  The Plaintiff admits that the forecast of evidence related to the meeting shows that the Defendant considered the job share proposal "very seriously" and "discussed it extensively."  [Doc. 17 at 6-7; Doc. 18-18].  That forecast of evidence shows that the Defendant treated the job proposal as a realistic option, not one that was anticipated to be denied for a pretextual reason.

---

[12] The lack of pretext is also shown by other parts of the forecast of evidence.  The Defendant provided the Plaintiff with six months of paid leave so she could recover, offered her other accommodations, and notified her about other open positions.  [Doc. 18-1; Doc. 18-2 at 31-33; Doc. 18-41].

## b.     The Defendant's Reasons for Denying Job Share

The Plaintiff claims that the Defendant initially gave no reason for the refusal of the job share proposal and only later claimed it was for business reasons related to Hunt's performance.  The Plaintiff further claims that the forecast of evidence shows that Hunt was a strong performer and any concerns about Hunt's performance would have been mitigated by the job share.

The forecast of evidence, however, shows that the concerns about Hunt's performance were well-documented and were not manufactured to create a pretextual reason for denying the job share proposal.  According to Anderson, she never had "a problem with [the Plaintiff] for job share" and "[i]t wasn't [the Plaintiff's] ability that I really had a question about ever."  [Doc. 18-12 at 285, 295].   Rather, Anderson was concerned about Hunt's performance.  [Id. at 85].  Anderson's issues with the job share proposal included that: (1) Hunt lacked attention to detail regarding expense reports; (2) Hunt lacked attention to detail regarding oversampling of certain products; (3) Hunt was one of the lowest ESPs in the district in achieving a Sanofi metric known as Call Plan Adherence; (4) the proposal did not include a day when they would work together, which was important for planning; (5) Anderson only recently had begun supervising Hunt and felt uneasy about

approving job share for such a new employee; (6) the Greenville territory could not support a job share because it was underperforming at the time of the request; (7) Anderson felt that Hunt and the Plaintiff did not meet the qualifications for a job share; and (8) the recent restructuring had created a tense environment within the company.  [Id. at 85-88, 236, 300; Doc. 18-49 at 2].  These concerns are well-documented in the forecast of evidence.  For instance, Hunt's text messages from when she worked under Anderson show that she felt "like I am not trusted and that I'm seen as an employee that lacks attention to detail."  [Doc. 28-2 at 268].

Hunt's 2017 mid-year performance review also documents the numerous issues she had under Anderson's supervision in the beginning of 2017.  In her self-evaluation contained in that review, Hunt wrote that her "[s]trategic planning could be improved *for the second half of the year*" and that her "[p]lanning and strategizing will be more successful *due to more familiarity* to new territory."  [Doc. 18-45 at 3] (emphasis added).  Hunt also wrote that due to changes in the sales organization related to the restructuring, "things that are important have perhaps fallen behind."  [Id. at 6].  Anderson wrote in that review that "*[e]arly in the year*, [Hunt] had some missteps with appropriate sampling, but quickly corrected her mistakes."  [Id. at 8] (emphasis added).  Finally, Hunt admitted in the review that "[t]he

30

beginning of the year was admittedly challenging to adapt to with all of the .

. . changes." [Id. at 7]. The beginning of 2017 was the only time that

Anderson had supervised Hunt before she received the job share proposal.

The Plaintiff argues that her forecast of evidence still presents an issue

of fact because Hunt expressed that she adapted to the new role by the time

the job share proposal was submitted in March 2017. [Id. at 275]. The

Plaintiff, however, points to nothing to overcome the several other concerns

regarding Hunt's performance to show that the Defendant's reasons for

denying the job share proposal were pretextual.

The Plaintiff also argues that the Court should look at the forecast of

evidence over a broader period of time. She asserts that Hunt received a

good performance review and had won an award for her comparatively high

sales figures under a previous manager in 2016. [Doc. 28-2 at 166]. At the

hearing on the cross-motions for summary judgment, the Plaintiff also

pointed out that Hunt's previous manager sent an email to Anderson

recommending that she approve the job share request. The Plaintiff claims

that Anderson's refusal to consider Hunt's prior employment history further

shows the pretextual nature of the Defendant's decision.

Anderson testified, however, that she decided to base her decision

solely on her personal experience managing Hunt during the first months of

2017.  [Doc. 18-12 at 300].  Hunt had numerous issues during those months.

[Doc. 18-45 at 3-7].  Anderson's refusal to consider Hunt's prior work

performance may not have been the "right choice[,]" but that does not mean

that Anderson's decision was "an illegal choice."  Coats, 916 F.3d 327, 345

(4th Cir. 2019).  The Court does not "sit as a kind of super-personnel

department weighing the prudence of employment decisions."  Feldman, 752

F.3d at 350.

Similarly, the Plaintiff argues that the denial was pretextual because

the job share would have diminished any purported concerns about Hunt's

performance by allowing the Plaintiff to take half of Hunt's responsibilities.

[See Doc. 17 at 18].  While Hunt had strong sales figures, Anderson's

concerns about Hunt's job performance related to her poor attention to detail

and similar procedural issues, not her sales ability.  Hunt's procedural issues

included trouble with filing expense reports, adhering to call plans, controlling

samples of products, and strategizing and planning.  [Doc. 17 at 17; Doc. 18-

12 at 236; Doc. 18-45 at 3].  In addition, Hunt's procedural issues were

magnified by the changes associated with the restructuring.  [Doc. 18-45].

These shortcomings would have been exacerbated by a job share.

Strict attention to and documentation of the details is all the more crucial

when coordinating with a job share partner.  Also, working fewer hours would

tend to push Hunt to focus more on sales and less on paperwork and other procedural details.  In this way, a job share would have halved Hunt's greatest strength – her sales abilities – by only having her work half of each week.  Further, the job share proposal did not include a day when the Plaintiff and Hunt would work together, which would tend to make Hunt's planning and handling procedural issues more problematic.  [Doc. 18-12 at 88].  As such, the Plaintiff's argument is unsupported by the forecast of evidence.

### c.    Anderson's Comment

The Plaintiff claims that Anderson allegedly saying "I bet there's more to that story" regarding the Plaintiff's termination is evidence that the Defendant's stated reason for the Plaintiff's termination was a pretext.  [Doc. 24 at 21].  The Plaintiff's argument as to what this statement might mean is simply conjecture and speculation.[13]   Moreover, the Plaintiff presents no evidence of the context in which this statement was made.   Through discovery, the Plaintiff has obtained numerous communications between the Defendant's employees regarding the job share proposal, the Plaintiff's return to work, and possible accommodations for the Plaintiff.  The Plaintiff

---

[13] Notably, there is no discussion of this quote in the excerpts of the Anderson deposition that were filed on the record in this case.

can point to nothing in any of those documents to support her assertion regarding Anderson's comment.

### d. Failure to Reconsider After Hunt's Review

The Plaintiff also argues that the Defendant's refusal to reconsider the job share proposal after Hunt received her 2017 mid-year performance review from Anderson is evidence of discrimination. The forecast of evidence does not show, however, that Hunt or Perdue ever submitted a new job share proposal or requested another review of their original proposal. Further, a job share involving Hunt was not realistic during that time because of *Hunt's* health troubles, leave of absence, continued problems with Anderson, and the Defendant's pending restructuring.[14]

The Plaintiff's forecast of evidence is insufficient for a jury to find pretext in this case. That evidence, even taken in the light most favorable to the Plaintiff, shows that the Defendant rejected the job share proposal for a legitimate business reason after seriously considering its viability and attempting to find alternative accommodations that would enable the Plaintiff to remain employed by the Defendant. [Doc. 17 at 6-7]. After those efforts

---

[14] Moreover, even though the Plaintiff characterizes Hunt's review as "good," the document itself reflects that Anderson continued to have reservations regarding Hunt. [Doc. 18-45]. Cole described that Hunt's 2017 mid-year performance review as simply "okay." [Doc. 23-5 at 211].

failed, the Plaintiff was terminated because the Defendant "could not grant what amounted to an indefinite leave." [Id. at 11].

The Defendant has articulated a non-discriminatory reason for denying the job share proposal and the forecast of evidence shows that the Defendant's reason was not merely a pretext for discrimination. Therefore, the Plaintiff has failed to show that the Defendant's proffered reason for denying the job share was pretextual and summary judgment will be granted for the Defendant.

The Plaintiff's forecast of evidence has failed to present a triable issue of fact regarding whether the job share proposal was ever available as a reasonable accommodation because the job share position was never vacant and the Defendant's explanation for denying the job share proposal was not pretextual. The Plaintiff has failed to offer any evidence of any other reasonable accommodation that would have enabled her to perform the essential functions of the position that she held or a vacant position that she desired.[15] See 42 U.S.C. § 12111(8). As such, the Plaintiff's forecast of

---

[15] According to the Plaintiff, she is a qualified individual because she has "the ability to do other jobs within the company that [she] desires." [Doc. 24 at 5 (citing Smith, 180 F.3d at 1160-1161]. The Plaintiff, however, fails to acknowledge that the Court in Smith said that the "desires" language only applies to "*available* reassignment job[s]." Smith, 180 F.3d at 1161 (emphasis added). The Plaintiff failed to identify an *available* reassignment job that she could perform with or without reasonable accommodation.

evidence is insufficient to raise an issue of fact as to whether the Defendant failed to reasonably accommodate the Plaintiff in violation of the ADA.

## B.    Failure to Engage in the Interactive Process

The Plaintiff's second claim is that the Defendant failed to engage in the interactive process required by the ADA.  [Doc. 1 at ¶ 55; Doc. 20 at 23].

The ADA imposes a good-faith duty on employers and employees "to engage in an interactive process to identify a reasonable accommodation" once an employee communicates her disability and a desire for accommodation.  Jacobs v. N.C. Admin. Office of the Courts, 780 F.3d 562, 581 (4th Cir. 2015) (citing Wilson, 717 F.3d at 346).  "[B]oth parties have an obligation to proceed in a reasonably interactive manner to determine whether the employee would be qualified, with or without reasonable accommodations, for another job within the company and, if so, to identify an appropriate reassignment opportunity if any is reasonably available." Smith, 180 F.3d at 1172.  The interactive process "is not an end in itself; rather it is a means for determining what reasonable accommodations are available to allow a disabled individual to perform the essential functions of the position sought."  Wilson, 717 F.3d at 347 (quoting Rehling v. City of Chicago, 207 F.3d 1009, 1015 (7th Cir. 2000)).

"[A]n employer will not be liable for failure to engage in the interactive process if the employee ultimately fails to demonstrate the existence of a reasonable accommodation that would allow her to perform the essential functions of the position." Jacobs, 780 F.3d at 581; see also Wilson, 717 F.3d at 347 ("[A]n employer who fails to engage in the interactive process will not be held liable if the employee cannot identify a reasonable accommodation that would have been possible."). The Plaintiff "bears the burden of identifying an accommodation that would allow a qualified individual to perform the job." Shin v. Univ. of Maryland Med. Sys. Corp., 369 F. App'x 472, 481 (4th Cir. 2010).

First, the Plaintiff argues that the Defendant's failure to engage in the interactive process is shown by the Defendant taking "many months to simply deny" the Plaintiff's job share proposal. [Doc. 20 at 21]. It is undisputed that the Defendant received the job share proposal on or about March 9, 2017, and denied the proposal on or about May 3, 2017. Therefore, contrary to the Plaintiff's argument, the Defendant did not take "many months to simply deny" the Plaintiff's job share proposal. [Doc. 20 at 21]. Instead, as the Plaintiff admits, the Defendant took less than two months to "very seriously" and "extensively" review the proposal. [Doc. 17 at 6-7]. In fact, the Plaintiff's conceding that the Defendant's review of the job share proposal was serious

and extensive undermines her argument that the Defendant failed to participate in the interactive process to find a reasonable accommodation for her.

Second, the Plaintiff argues that the Defendant's failure to engage in the interactive process is shown by the Defendant not revisiting "the job share issue" after denying the Plaintiff's job share proposal. [Doc. 20 at 22]. The Defendant, however, never revisited the job share proposal during the Plaintiff's leave for several reasons.  The job share proposal became untenable shortly after it was denied because Hunt suffered a seizure that caused her to take a two-month leave of absence.  [Doc. 28-2 at 198-99, 222].  Hunt returned to work on July 17, 2017, but the cause of her seizures was still undetermined.  [Id. at 222-23].  Hunt's health would have lent complete uncertainty to any such job share proposal.

Hunt also continued to have issues with Anderson even after returning from her medical leave, which ultimately led her to resign in November of 2017.  [Id. at 50].  There is no evidence that Hunt was willing to go along with a job share under Anderson after returning from her leave of absence.

Roughly a month after Hunt returned from leave, the Defendant announced that it was going to restructure again at the end of 2017.  [Id. at 224].  While the law allows for accommodations by moving an employee to

a "vacancy," there would not be any vacancies until the new structure had been determined. Even if the job share proposal had been reconsidered and approved, its future would have been most uncertain given the restructuring.

Moreover, it is undisputed that the Defendant's neutral, nondiscriminatory policy required employees to request a job share before a manager will review their proposal. [See Doc. 18-4]. As such, it was up to the Plaintiff and Hunt to submit a new job share proposal or to request reconsideration of their original job share proposal. Neither the Plaintiff nor Hunt submitted a new job share proposal or asked Anderson to reconsider their original proposal.[16]

Even if the Plaintiff had resubmitted the job share proposal, the Plaintiff fails to articulate how the Defendant could reasonably have made a cogent business decision in reassessing the job share proposal given Hunt's medical issues, Hunt's recent two-month absence, Hunt's continued issues with Anderson, and the Defendant's pending restructuring.

Third, the Plaintiff argues that the Defendant's failure to engage in the interactive process is shown by it keeping the Plaintiff "on medical leave . . .

---

[16] Even before the second restructuring was announced, the Defendant was rumored to be preparing for such. [Doc. 18-20 at 2]. The Plaintiff testified that she hoped that she would be reassigned to the Greenville territory as part of the potential restructuring. [Id.]. But she never submitted a new job share proposal.

after job share was denied, even though her physician updated her condition every three weeks indicat[ing] she could work part-time near Greenville." [Doc. 20 at 22].  The Defendant extended the Plaintiff's medical leave of absence three times, for a total of six months, while it tried to identify a reasonable accommodation.  [Doc. 18-16].  During that leave of absence, several of the Defendant's employees discussed options to accommodate the Plaintiff, including the Plaintiff's job share proposal.  [Docs. 18-18; 18-19; 18-20; 18-25; 18-26].  Despite those efforts, the Plaintiff never identified a reasonable accommodation that would have allowed her to perform the essential functions of her position or another vacant position.  [Doc. 18-1]. The Plaintiff also requested a part-time position during her leave of absence, but the Defendant responded that no part-time position was available at that time.  [Doc. 18-26].  As addressed supra, reassignment to a permanent part-time position from a full-time position and the creation of an entirely new position are not reasonable accommodations.  See Nartey-Nolan, 91 F. Supp. 3d at 775 (stating that assigning an employee to a permanent part-time position when the employee's primary position is full-time is not a reasonable accommodation); Bilinsky, 928 F.3d at 572 (stating that the ADA does not require an employer to create a new position as an accommodation to a disabled employee).

Finally, the Plaintiff argues that the Defendant's failure to engage in the interactive process is shown by the fact that it did nothing after denying the job share proposal. [Doc. 20 at 9]. During that same period, however, the Plaintiff never identified a reasonable accommodation. Jacobs, 780 F.3d at 581. The Plaintiff only requested the job share and thereafter a part-time position in Greenville as accommodations. Neither of those, however, could serve as a reasonable accommodation. Because the Plaintiff never identified a workable reasonable accommodation, the Defendant has no liability to the Plaintiff for failure to engage in the interactive process.

## C.    Termination of Employment

The Plaintiff argues that the Defendant violated the ADA by "terminating her employment." [Doc. 1 at ¶¶ 55-56]. The Plaintiff's own forecast of evidence, including her own physician's opinions, shows that the Plaintiff was unable to perform the functions of her position as an ESP in the Asheville territory. Thus, unless the Plaintiff could be accommodated by transfer to some vacant position that she was capable of performing, her termination did not violate the ADA. See 42 U.S.C. § 12111(8).

As stated above, the job share position was not a reasonable accommodation because it was not a reassignment to a vacant position. That fact, taken with the Plaintiff's having never requested or identified a

reasonable accommodation that would enable her to perform the essential functions of her position or another position she desired, allows for termination. 42 U.S.C. § 12111(8). "[E]mployers are not obligated to retain a disabled employee on unpaid leave indefinitely or for an excessive amount of time." See Myers v. Hose, 50 F.3d 278, 283 (4th Cir. 1995).

## D.  Retaliation for Requesting a Reasonable Accommodation

The Plaintiff claims that the Defendant retaliated against her because she requested a reasonable accommodation. [Doc. 1 at ¶ 56]. To prevail on an ADA retaliation claim, "a plaintiff must show that: (1) [s]he engaged in protected conduct; (2) an adverse action was taken against [her] by the employer; and (3) there was a causal connection between the first two elements." Ullrich, 709 F. App'x at 753. "If this burden is met, the plaintiff must then show by a preponderance of the evidence that the proffered reason [for the adverse action] is pretextual or [her] claim will fail." Id. Therefore, to prevail on her claim, the Plaintiff must show that the Defendant's reasons for terminating her employment were pretextual. As addressed above, however, the forecast of evidence shows that the Plaintiff was terminated because she was unable to identify a reasonable accommodation that would enable her to remain employed by the Defendant. As such, the Defendant was unable to keep her on "unpaid leave

indefinitely or for an excessive amount of time." See Myers v. Hose, 50 F.3d 278, 283 (4th Cir. 1995); see also 42 U.S.C. § 12111(8). Therefore, the Plaintiff has failed to establish that the Defendant's proffered reason for terminating her was pretextual and summary judgment will be granted for the Defendant.

### E. Discharge in Violation of North Carolina Public Policy

Finally, the Plaintiff claims that the Defendant's decision to terminate her employment violates North Carolina public policy. [Doc. 1 at ¶¶ 59-68]. The North Carolina Equal Employment Practices Act states that

> [i]t is the public policy of this State to protect and safeguard the right and opportunity of all persons to seek, obtain and hold employment without discrimination or abridgement on account of race, religion, color, national origin, age, sex or handicap by employers which regularly employ 15 or more employees.

N.C. Gen. Stat. § 143–422.2. North Carolina courts "look to federal decisions for guidance in establishing evidentiary standards and principles to be applied in discrimination cases." Johnson v. Crossroads Ford, Inc., 230 N.C. App. 103, 110, 749 S.E.2d 102, 107 (2013). Therefore, the Plaintiff's state law claim for wrongful discharge may also be analyzed under the federal-law framework. See, e.g., id. For the reasons previously stated, the Plaintiff is

not entitled to relief under the ADA, so her state law claim for wrongful discharge also must fail.

### F. Plaintiff's Partial Motion for Summary Judgment

The Plaintiff moved for summary judgment regarding the Defendant's liability and certain affirmative defenses. [Doc. 19]. The Court having determined that the Defendant's Motion for Summary Judgment should be granted, for the same reasons the Plaintiff's motion is denied.

## V. CONCLUSION

The Plaintiff claims that the Defendant violated the ADA by failing to accommodate her disability and terminating her employment. [Doc. 1 at ¶¶ 55-56]. The Plaintiff preferred a job share as an accommodation, but the ADA did not require the Defendant to grant the job share proposal because the job share was not a reassignment to a vacant position. The Defendant, however, seriously and extensively considered the job share proposal and denied the job share proposal in accordance with its policy due to concerns about the performance of the other employee involved in the proposed job share. After the proposal was denied, the Defendant kept the Plaintiff on leave while it continued to seek an accommodation that would allow the Plaintiff to remain employed. After those efforts failed, the Defendant terminated the Plaintiff's employment because the Plaintiff was unable to

identify an accommodation that would enable her to continue her employment.  In light of this forecast of evidence, no reasonable jury could conclude that the Defendant's actions constituted discrimination against the Plaintiff under the ADA.

## O R D E R

**IT IS, THEREFORE, ORDERED** that the Defendant's Motion for Summary Judgment [Doc. 16] is hereby **GRANTED** and this action is hereby dismissed.  **IT IS FURTHER ORDERED** that the Plaintiff's Motion for Partial Summary Judgment [Doc. 19] is hereby **DENIED**.  A judgment shall be entered simultaneously herewith.

**IT IS SO ORDERED.**

Signed: October 2, 2019

Martin Reidinger
United States District Judge